UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JANET SEBOLD,                    :
        Plaintiff,               :
                                 :
        v.                       :     Civ. No. 3:05-CV-1205(AHN)
                                 :
CITY OF MIDDLETOWN,              :
JAMES MILARDO, and               :
DOMINIQUE THORNTON,              :
        Defendants.              :


RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

    Janet Sebold ("Sebold"), a former dispatcher for the City of

Middletown, brings this employment discrimination action against:

(1) James Milardo ("Milardo"), her former supervisor and the

communications director of Middletown, in both his official and

individual capacities; (2) Domenique Thornton ("Thornton"), the

former mayor of Middletown, in both her official and individual

capacities; and (3) the City of Middletown ("the City").

    Pending before the court are the defendants' motions for

summary judgment [docs. # 74, 76, and 77].[1]  For the reasons

_____

        [1]  The City and Thornton also moved to strike [doc. # 108]
certain paragraphs from the D. Conn. L. Civ. R. 56(a)(2)
statements attached to Sebold's memorandum in opposition to their
motions for summary judgment.  The defendants claim that Sebold
fails to support her denials of fact with citations to the record
and that some of those citations provided are not supported by
the record.  A motion to strike, however, is an inappropriate
vehicle for attacking Sebold's 56(a)(2) statements because: (1)
Fed. R. Civ. P. 12(f) specifically states that a motion to strike
is used to strike pleadings, but a Rule 56(a)(2) statement is not
a pleading, see Fed. R. Civ. P. 7(a); and (2) a motion to strike
is unnecessary because Rule 56(a)(1) specifically provides that a
court will only consider statements "supported by the evidence,"
and therefore, to the extent that Sebold's Rule 56(a)(2)
statements are unsupported by the evidence, the court will simply

given below, those motions are GRANTED IN PART and DENIED IN PART.

## FACTS AND PROCEDURAL BACKGROUND

Resolving all ambiguities and crediting all factual inferences that could rationally be drawn in Sebold's favor, as the non-moving party, the record indicates the following facts: Sebold, f/k/a Janet Groeper, was, at the time relevant to this action, a 59-year-old female employed in the Central Communications Department ("Central Communications"), which coordinates all emergency response for the City. She began employment with the City in 1990 as a civilian dispatcher in the police department before the City centralized its communications departments. In August 1999, after working in another position for the City, Sebold began working as a dispatcher in Central

_____

disregard them. See Ricci v. Destefano, No. 3:04CV1109(JBA), 2006 WL 2666081, at *2-3 (D. Conn. Sept. 15, 2006). Therefore, the City and Thornton's motion to strike [doc. # 108] is DENIED.

Sebold also moves to amend her Rule 56(a)(2) statement [doc. # 113] to include the section, called "Disputed Issues of Material Fact," which counsel claims he accidentally omitted. Because the defendants submitted the entire record on which Sebold relies and because the court has carefully reviewed the entire record, the court finds that the defendants will not be prejudiced by allowing Sebold's amendment. The motion to amend [doc. # 113] is therefore GRANTED.

Communications under Milardo's supervision.[2]  Sometime in 2001
Milardo promoted Sebold to "lead dispatcher," a position holding
responsibilities that the parties dispute.

Sebold had a good relationship with Milardo when she began
working with him.  She describes him at that time as being "very
kind" and "sympathetic" and characterizes their relationship as
that of a brother and sister.  However, beginning in July 2001
and continuing until she transferred from Central Communications
in February 2004, Sebold testifies that Milardo began to
discriminate against her based on her gender and age.

Milardo disputes all of Sebold's testimony regarding his
conduct, and therefore, the following allegations are disputed.
Nevertheless, the court construes these facts, and the inferences
therefrom, in Sebold's favor for purposes of this motion because
she is the non-moving party.

I.   Milardo's Conduct Directed at Sebold

Sebold testifies that Milardo's objectionable conduct toward
her began in 2001, around the time that she began dating her

---

[2]  In October 1997, Sebold left the police department and
took a position with the City as a budget analyst, where she
worked until June 1999, when she took leave following the death
of her husband pursuant to the Family Medical Leave Act ("FMLA").
In August 1999, however, when Sebold returned to work, the City
had filled her position and so she accepted the civilian
dispatcher position in Central Communications under Milardo.
Although Sebold claims that the City unlawfully filled her
position when she was on FMLA leave, she does not bring claims
based on that fact.

current husband, who was a police officer in the City.  Milardo admits he dislikes police officers due to unexplained work-related friction.  Nevertheless, she also states that Milardo's conduct "really got out of control" in mid-2002, after he and the City settled an employment discrimination action brought by her female coworkers.  After that time, Milardo "started coming down on [her] heavy, until [she] couldn't take it anymore."

Sebold testifies that on "more than several occasions" Milardo told her that, as a lead dispatcher, she "better grow some balls."  In another instance, when she complained that a trainee was not performing well, Milardo told her that she just had the "the ass out" for the trainee.  She testifies that Milardo "many times" stated "out with the old and in with the new" in reference to workers at the "old" dispatch center, but that she found the comments insulting because she came from the old dispatcher center and she was the second oldest female in Central Communications.  Sebold recounts that Milardo frequently stated that her future husband was "nothing but trouble," that he was "an asshole," and that he did not want her to go out with him, and made fun of her for being "one of them," meaning a police officer.  To needle Sebold, he said, for example, "Hey, Janet, here's donuts.  Why don't you have one?  You're married to a cop."  He also made a point of continually making fun of police officers in her presence, saying, for instance, that one police

officer had a gambling problem and wondered aloud "if his wife
knows where he's sticking his dick."  She testifies that he
"constantly" referred to police officers as "assholes" and
insinuated that they were weak and cowardly by referring to them
as "pansies," "babies," "crybabies," and commenting that they
were afraid to do their jobs.

In addition to these more general allegations, Sebold
testifies to specific incidents where Milardo discriminated
against her.  The first incident occurred on December 18, 2002
when Milardo required her to use vacation time to attend a
gynecologist appointment ("Doctor's Appointment Incident").[3]
Sebold testifies that when she requested the whole day, rather
than half a day, off because of medical issues, he "absolutely
went off," screaming at her in front of her colleagues.  When she
explained that she needed the full day because she had been sick,
he said, "Yeah, right."  After witnessing how upset Milardo
became over this, she told him that she would come in as planned,
but Milardo said, "No, you're not, and you're not using any sick
time, you're taking a vacation day, and don't you show your face
tomorrow because I won't let you in the door."

Sebold next testifies that on July 15, 2003 Milardo failed
to assist her when she claimed to be suffering a heart attack

---

[3]  The record does not make clear whether Milardo knew, or
should have known, this was a gynecologist appointment.

("Anxiety Attack Incident").  On that day, Milardo called Sebold
into his office and, with the door either shut or slightly ajar,
loudly accused her of leaking confidential business information
about a bomb threat to the Hartford Courant.  She testifies that
his face was "beet red" and his "neck veins st[u]ck out."
Despite Milardo's accusations, Sebold testifies that she was not
working when the information about the bomb threat came in to
Central Communications.

Within thirty minutes of confronting her, Sebold began to
experience chest pains and numbness in her arm, which she
believed were symptoms of a heart attack.  She expressed her
distress to Milardo and other male dispatchers who were present
and asked Milardo if she could leave work, but he refused to
allow her to leave without finding a replacement to cover her
station.  Milardo denies knowing the acuteness of Sebold's
distress.  Sebold, however, did not call an ambulance for herself
or seek help from the fire department, which is in the same
building as Central Communications.

After she conveyed her distress to Milardo, Sebold testifies
that he yelled at her because she failed to report a 911 call to
Central Communications the previous night when she was on duty.
She states, however, that the call involved a minor accident, one
which Milardo normally did not require her to report.  She states
he purposefully confronted her during the Anxiety Attack Incident

to heighten her distress.

After Sebold continued to complain about her symptoms and she could not find a replacement dispatcher, Milardo told her that if she was unfit to do her job she could go home.  She left work and drove herself home, smoking a cigarette on the way.  Medical treatment later revealed that Sebold suffered from an anxiety attack, not a heart attack.  This incident – from the time Milardo confronted her about the bomb threat to the time she left Central Communications – took approximately forty minutes.

Sebold testifies that another time when a younger male complained about an earache, Milardo personally covered for him until a replacement could be located.

The next incident Sebold recounts occurred around September 14, 2003, when Milardo improperly forced her to use paid leave to attend a workers' compensation hearing that took place during the workday ("Paid Leave Incident").  Sebold wrote Milardo to inform him that she was required to attend the hearing and to ask how she should account for her time away from work.  Milardo informed her that she would have to use vacation or personal time to attend the hearing.  Instead, Sebold elected to forego pay.  When Milardo realized that she had not chosen either vacation or personal time, he confronted her and they argued in front of coworkers about how she should account for her time.  She testifies that he put his hand up in her face when she questioned

him and threatened to write her up for insubordination if she continued to question his order about how to account for the absence.

Later that day, when Sebold asked her coworkers to write down what they had witnessed, Milardo backed her into a corner and screamed at her in front of her coworkers. She testifies that he screamed at her for between two and two and a half minutes, waving either his finger or a pencil a few inches from her face, stating, "They are not your little slaves; I'm the boss." She testifies that she felt frightened, intimidated, and embarrassed as a result of this incident. She further states that she never witnessed Milardo physically confront another coworker in this manner.

In another incident, on December 29, 2003, Sebold testifies that she became physically sick when Milardo demanded she turn over unspecified documents and stated in front of her coworkers that "your Union and I agreed not to discipline you until after the holidays." ("Documents Incident").

II. <u>Conduct Directed at Other Females</u>

Sebold testifies that Milardo's conduct toward other females contributed to her hostile work environment. According to Sebold, Milardo directed much animosity toward the females who

filed another employment discrimination lawsuit.[4]  He
collectively nicknamed them "BOB," short for "bunch of bitches."
She also testifies that he nicknamed one of the plaintiffs
"Patches" due to the discoloration of her skin and remarked about
another plaintiff's obesity that "you had to roll her in flour to
find her wet spot."  When Sebold professed that she did not
understand this latter comment, Milardo said, "Come on," until
she understood his meaning.

    She also testifies that Milardo frequently made known that
he hated a particular female police sergeant.  In one instance,
he and other coworkers shared in a joke, told by Sebold's female
coworker, that the police sergeant "needed her carpet cleaned" to
improve her mood.  In another instance, Milardo wrote a letter to
the sergeant, stating that he was "going to take her out."
Sebold testifies that this behavior was typical of how Milardo
treated females.

    In addition to Milardo's gender-based animus, Sebold
testifies that her workplace was filled with lewd jokes and
behavior implicating females.  She states that her coworkers
constantly watched the Jerry Springer Show, which she found
offensive.  When she complained about it, Milardo turned it off

_____

    [4]  Sebold did not join the suit because, at that time, she
believed that Milardo treated her well.  According to the
representations of counsel at oral argument, that suit settled
around July 2002 for $400,000.

but mocked her in front her coworkers by stating "[y]ou can't say that in front of Janet."  She states that "[e]verything these young guys wanted, they couldn't have because of me."  While Milardo sent out an email cautioning dispatchers about foul language, Sebold testifies that he placed the onus on lead dispatchers, such as herself, to curb the language, while at the same time undermining her authority by publicly belittling her.

In addition, she testifies that her male coworkers frequently trained outdoor surveillance cameras on female college students standing across the street from Central Communications and zoomed in on their breasts or buttocks, while making comments such as, "Look at those tits," or "What a great ass she's got."  Another time her coworkers zoomed in on a young couple "making out" and said, "Where's his hand?"  Despite her complaints to Milardo that this conduct made her feel embarrassed and uncomfortable, the improper use of the surveillance cameras "went right on until [she] left there."

Another time, when she registered her discomfort with lewd jokes and banter in Central Communications, Milardo told her to "shut up" and to "suck it up" because she could not "take a joke."  She also states that when she complained, Milardo "ran after [her] out of the door one day [while] yelling at [her] because [she] couldn't take it anymore."

In another instance, Milardo stated to her colleagues that

they should not joke around Sebold because she was from the "old school."  She sums up Milardo's lack of responsiveness to her complaints by stating that "no matter what filthy things or whatever was being said and done in the room, the gestures, you know, it was me."

III. <u>Evidence of Retaliation</u>

When Sebold threatened to file a grievance, Milardo laughed at her and said, "See how far you get," and that he would "see [her] in two years" because he had "this administration in his pocket."  As soon she filed a grievance or suggested improvements for the department, she testifies that she was "not allowed to speak any longer."  She was "cut off when speaking, interrupted or totally ignored," and when she voiced her concerns Milardo told her to "stop" or "knock it off," while "other employees could say anything they wanted."

She also gives examples of Milardo's retaliatory nature. When police officers made off-color remarks over the dispatch system, Milardo kept the tapes of those comments in his office so that he would have something against the police officer. According to Sebold, at one point, he kicked the box of these tapes and said "I have enough to bury the police department and the City right here."  He also remarked that if police officers threw "rocks" at him, he would counter with "boulders" or "grenades."  In addition, Milardo demonstrated to Sebold that he

had the plaintiff-dispatchers under audio and video surveillance and said, "See, I can prove right here that they're not unhappy and miserable. They're laughing and joking." According to Sebold, Milardo told the dispatchers they were not under audience surveillance. He did these things, Sebold says, because he was "always trying to make you fearful of him" and to make clear that "he's in control." According to Sebold, "it was a known fact in dispatch that if you complained about Jim Milardo, and he made this very clear, that, in plain English, there would be hell to pay. You would be his next victim and watch out, . . . because as soon I did complain, that was the end of me." She further testifies that "[r]etaliation was such a huge factor under the Milardo regime, that if you said anything, you were just persecuted, and when I did finally speak up and say enough is enough, that's when all this happened to me," referring to the disciplinary actions discussed below.

IV. Disciplinary Actions Taken Against Sebold

It is undisputed that Sebold had never been disciplined during the first thirteen years she worked as a dispatcher and budget analyst for the City. After the Paid Leave Incident, however, Milardo issued Sebold a notice of hearing on September 23, 2003, for ignoring his written directive regarding the accounting of her leave. Two days later, Sebold and her union representative attended a hearing with Milardo regarding her

insubordination.  After Sebold expressed no remorse and offered
no adequate reasons for her failure to obey Milardo's directive,
Milardo issued a written warning on October 15, 2003.  He
declined, however, to pursue further discipline.  Ultimately, the
City recognized its error in requiring Sebold to use either sick
or personal time to attend the workers' compensation hearing and
restored her sick time on December 5, 2003.  No evidence
indicates that this warning for insubordination was ever removed
from her record.

Sebold was also disciplined for two other incidents.  In the
first incident, which occurred on October 15, 2003, Sebold was
working as lead dispatcher when two dispatchers failed to
properly dispatch a police officer to check on the well-being of
an elderly gentleman, after a neighbor reported that he had not
yet retrieved his morning paper ("Neighbor Incident").  First
responders later found the man dead in his home.

Milardo issued Sebold an "official written warning" for
failing to properly supervise her staff.  The incoming call was
answered by a younger, male dispatcher, who entered a vague
narrative entry that caused the police to misinterpret the call,
resulting in delayed response.  Another male dispatcher never
relayed information about the call to her, and as a result, the
call was pushed to the bottom of the priority list.  Milardo
states that Sebold saw the call pending and failed to expedite

the call or properly follow up when she learned the nature of the call.  Milardo also issued an "official verbal warning" to the dispatcher who answered the incoming call.  He further ordered "written performance counseling" for another male dispatcher involved in the incident.  Sebold claims that her discipline was unjustified because "the wrong information was put into the computer by a male employee" and that it was "just another example of the female taking the blame."

In the second incident, which occurred on October 27, 2003, the City states that Sebold was the "dispatch supervisor"[5] on duty when dispatchers – different than those involved in the Neighbor Incident – failed to dispatch the fire department to an accident involving a car that had driven into a house ("Portland Incident").  Sebold was not dispatching during this incident; she was at Central Communications for paid training.  She testifies that when the dispatchers on duty appeared overwhelmed she instinctively called an ambulance.

After an investigation, Milardo issued an "official verbal warning" to Sebold for her failure to properly supervise those dispatchers and ensure that the fire department, in addition to an ambulance, was dispatched for this call.  Milardo also issued an "official verbal warning" to a male dispatcher and "written

---

[5]  The record does not make clear how, if at all, this title differs from Sebold's position of lead dispatcher.

performance counseling" to another male dispatcher for their roles in this incident. Milardo noted that Central Communications received as many as five 911 calls reporting this incident and that the fire chief afterwards wrote a letter to him requesting an explanation about why the fire department was not dispatched to this incident. Sebold testifies that her male superior who was training her was not disciplined for this incident.

    IV. <u>History of Grievances</u>

    Sebold first complained to Faith Jackson ("Jackson"), the City's human resources director, on December 18, 2002, after the Doctor's Appointment Incident. She told Jackson that she was "not overly concerned" with how her time off should have been allocated but that she did not like how Milardo addressed her. She stated that Milardo began to harass her when she started dating her future husband, but also expressed her belief that Milardo harassed her because she could no longer serve as an ally in the gender discrimination lawsuit brought against him by five female dispatchers. Sebold further warned that if Milardo's behavior went unchecked, she would sue the City and the judgment "would look like pennies" compared to a settlement received by her fellow dispatchers. Jackson recommended that Sebold reduce her oral complaint to writing, but Sebold did not do so until eight months later, in September 2003. Sebold testifies that she

feared pressing her complaints further because Milardo made clear that he would retaliate against anyone who opposed him. Neither Sebold nor Jackson relayed Sebold's oral complaint regarding the Doctor's Appointment Incident to Thornton during this time.

Between December 2002 and September 2003 Sebold made no complaints against Milardo, although she testifies that his objectionable conduct continued without abatement.

On August 11, 2003, following the Anxiety Attack Incident, Thornton met with Sebold, Sebold's husband, and Debra Moore ("Moore"),[6] the City's director of personnel, to address Sebold's complaints that her work environment was intimidating and hostile. Sebold related her version of the Anxiety Attack Incident and the Doctor's Appointment Incident. At this meeting, Thornton first learned of Sebold's December 2002 complaints of harassment.[7] Sebold requested a transfer to a budget analyst position in the police department with her current pay grade. Thornton, however, informed Sebold that the collective bargaining

_____

[6] After July 2004, Debra Moore changed her name to Debra Milardo. She is not related by blood or marriage to the defendant Milardo. To avoid confusion, though, the court will refer to her as Moore, even though her affidavit is signed with her married name.

[7] Sebold denies this fact, but the evidence supporting her contention is her own unsubstantiated suspicions, e.g., "I know that she had to be told by Debra Milardo and Faith Jackson the different – the many times he harassed me and the details of the harassment and threatening and hostility, and she still did absolutely nothing about it." (Pl.'s Dep. Tr. at 121:1-4).

agreement between the City and Sebold's union ("CBA") required her to conduct a formal investigation before a transfer could be authorized.

Thornton appointed Moore to investigate Sebold's allegations, and Moore conducted the investigation on August 26, 2003. She interviewed Sebold, Milardo, and three male dispatchers who were present during the Anxiety Attack incident and reviewed the silent surveillance video taken of Central Communications during the incident. A few weeks later, Moore issued her report finding insufficient evidence to support Sebold's claim that Milardo's conduct was designed to cause her injury. She recommended that the City not transfer Sebold to another department without following the procedures outlined by the CBA. Moore further suggested that Sebold and Milardo meet with a mediator to resolve their differences.

On September 11, 2003, the day after Moore issued her report, Sebold filed a "Step 1" grievance against Milardo for the Anxiety Attack Incident. The CBA establishes a three-step process for handling grievances, including allegations of improper disciplinary action and charges of discrimination. An employee must first file a Step 1 grievance with the employee's department head. After the department head's decision on the Step 1 grievance, the employee may file a "Step 2" grievance with the City's personnel director, in this case Jackson. If the Step

2 grievance is not resolved in the employee's favor, then she can file a "Step 3" grievance, which is heard by Connecticut's Board of Mediation and Arbitration.  In this case, the City relied on Moore's investigation to deny Sebold's Step 1 grievance the same day.

On September 23, 2003, Sebold met with Jackson to again complain that Milardo was hostile toward her.  Sebold again raised the Anxiety Attack Incident and related for the first time the Paid Leave Incident.  She also stated that he called the plaintiff-dispatchers "bitches."

On September 29, 2003, Sebold wrote a letter to Jackson further outlining why she believed that Milardo's conduct constituted harassment.  The letter concludes that Milardo used intimidation to prevent employees from exercising their rights, especially women.  Then the letter explained that Sebold failed to reduce her December 2002 complaints to writing because she feared retaliation.

On October 1, 2003, Sebold filed a Step 1 grievance, stating that her "[s]upervisor created a hostile work environment causing employee physical harm.  Workforce continues to present discriminatory practices."

On October 7, 2003, Sebold wrote a letter to Jackson criticizing the investigation by Moore and disputing many statements in the report.  In particular, Sebold states that the

report incorrectly attributes Milardo's "grow some balls" comment as being directed at a female police sergeant when, in fact, it was directed at her. Specifically, Sebold states that "Milardo told me as a supervisor I 'better grow some balls' on many occasions."

The following day, Sebold wrote a letter to Thornton also criticizing the investigation and describing the Paid Leave Incident, the Loudermill hearing, the grievances she filed, and Milardo's intimidating statements. Sebold also attached her previous letter outlining her critique of the investigation. Thereafter, at Thornton's insistence, Jackson began to reinvestigate the Anxiety Attack Incident and Sebold's other harassment complaints.

Jackson issued the report of her reinvestigation on December 19, 2003, which she sent directly to Thornton. After interviewing numerous employees at Central Communications, Jackson concluded that "there was no demonstrated or proven violation of the [Zero Tolerance] policy or facts to substantiate that Ms. Sebold has been harassed or intimidated by Mr. James Milardo or [that she] works in a hostile environment." Jackson recommended that the City could not transfer Sebold to another department without violating its policies and personnel rules, as well as the CBA.

On January 15, 2004, Sebold filed a Step 1 grievance against

Milardo for his allegedly harassing behavior during the "Documents Incident," and on January 29, 2004, the City held a hearing to address this grievance. Moore found that there was no evidence to substantiate Sebold's claims of harassment or hostile work environment and denied the grievance.

On February 1, 2004, Sebold filed a complaint pursuant to the City's zero tolerance policy for Milardo's allegedly harassing behavior related to the Documents Incident.

On February 4, 2004, Sebold filed: (1) a grievance related to the warning she received for the Neighbor Incident; (2) a grievance related to the warning she received for the Portland Incident; and (3) a grievance for having to take a test to be eligible for a budget analyst position for which she applied in late January 2004.

At some point during Sebold's complaints, Moore drafted a mediation agreement between Sebold and Milardo under which Sebold would drop her grievances. A condition of the agreement was that Sebold would not continue to complain about Milardo. A week after Sebold signed this agreement, Sebold testifies that Jackson told her that Thornton ordered her to finish her interview with Jackson about her allegations against Milardo. After Sebold met with Jackson, Moore issued a memorandum stating that the agreement was off between Sebold and the City because she had violated the terms of the agreement by speaking with Jackson.

All of Sebold's grievances were denied at Step 1.  Sebold, however, pursued her grievances related to the Anxiety Attack Incident and the Paid Leave Incident to Step 3 before the Board of Mediation and Arbitration.  In the midst of the hearing, when the City began to present its case, Sebold withdrew her grievances.  The record does not explain why she withdrew these grievances, but Sebold's counsel represented at oral argument that she chose to pursue her claims in federal court in lieu of arbitration.

## V.    Sebold's Alleged Constructive Discharge

Based on the conduct described above, Sebold testifies that she could not work in Central Communications any longer and she sought a transfer to a budget analyst position in the police department.  Although she had previously occupied a similar position for three years before coming to Central Communications, the City required her to take an examination.  All the applicants, including Sebold, failed this initial examination. The City again posted an opening for the position, and approximately thirty applicants took the rescheduled examination, which Sebold passed.  However, on the day that Sebold learned that she had passed the test, Thornton eliminated this position.

Thornton states that this position, along with every other budget analyst position in other departments, was eliminated for budgetary reasons.  She testifies that she had the authority

under the City's charter to unilaterally eliminate this position from the budget and that the City's common council approved this plan at two different council meetings.

Sebold applied for a budget analyst position in the water and sewer department that was ultimately given to a male.[8]  She also declined two other positions – an administrative assistant position at a school, where she felt the environment was dangerous; and a parking attendant position.  Sebold states that Moore directed her to positions for which she was unqualified. In support of this contention, she states that the City pointed to an opening about a delivery position where she would have to routinely lift more than fifty pounds.  The record does not indicate how much these positions paid compared to her position at Central Communications.  In addition, the record does not indicate if there were other positions available for which Sebold did not apply.

On February 14, 2004, Sebold requested and took personal leave pursuant to the FMLA.  While on leave, Sebold requested and received a transfer to a position in the tax assessor's office at $22,000 less per year than she made as a dispatcher.  She began working there on April 5, 2004, when she returned from her FMLA

_____

[8]  Sebold claims that this male's credentials could not be corroborated, insinuating that he was not qualified for the position, but during her deposition she admitted this information was secondhand and refused to reveal her source.  Therefore, the court does not consider this allegation.

leave.

Between April 2004 and November 2004, Sebold filed seven criminal complaints against Milardo, all of which were investigated and deemed "frivolous."  According to Sebold, Milardo harassed her outside the workplace by following her in his car, yelling at her, and making offensive and threatening gestures toward her.

In April 2005, Sebold requested a one-year leave of absence from the tax assessor's office.  Following this leave, which began on May 2, 2005, Sebold elected not to return to the tax assessor's office.

VI.  <u>Procedural History</u>

On June 8, 2004, Sebold filed an administrative charge of discrimination with the CHRO for dual-filing with the EEOC.  She received a right to sue letter from the EEOC on May 11, 2005, but the record does not reflect that she received a release of jurisdiction from the CHRO.

On July 29, 2005 Sebold filed a complaint alleging: (1) gender-based discrimination, hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Civil Rights Act of 1991 ("Title VII") against the City; (2) age-based discrimination, hostile work environment, and retaliation, in violation of the Age Discrimination in Employment Act, 42 U.S.C. §§ 621-34 ("ADEA") against the City; (3) gender- and age-based discrimination, in

violation of the equal protection clause of the Fourteenth
Amendment and 42 U.S.C. § 1983 against Thornton and Milardo; (4)
gender- and age-based retaliation, in violation of the
Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen.
Stat. § 46a-60(a)(4), against all defendants; (5) aiding and
abetting discrimination, in violation of CFEPA § 46a-60(a)(5)
against Milardo and Thornton; (6) First Amendment retaliation, in
violation of the First Amendment, 42 U.S.C. § 1983, and Conn.
Gen. Stat. § 31-51q against all defendants; (7) a violation of
her right to substantive due process rights under the Fourteenth
Amendment, pursuant to 42 U.S.C. § 1983, against all defendants;
and (8) intentional infliction of emotional distress against all
defendants.[9]

## STANDARD

Summary judgment should be granted if the record
demonstrates that there is no genuine issue as to any material
fact and that the moving party is entitled to judgment as a
matter of law.  See Fed. R. Civ. P. 56(c); Chambers v. TRM Copy
Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994).  The burden of
demonstrating the absence of any genuine issue of material fact
rests on the moving party, see Celotex Corp. v. Catrett, 477 U.S.
317, 323 (1986), and all ambiguities and inferences that may

---

[9]   The complaint also referenced a negligent infliction of
emotion distress claim, but Sebold's counsel represented at oral
argument that he now withdraws that claim.

reasonably be drawn from the facts must be viewed in the light
most favorable to the nonmoving party, see Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248-49 (1986).  Once a party moving
for summary judgment has made a properly supported showing as to
the absence of any genuine issue as to all material facts, the
nonmoving party, to defeat summary judgment, must come forward
with evidence such as affidavits, deposition testimony, answers
to interrogatories and admissions on file, that show there is a
genuine factual issue for trial.  See, e.g., Amnesty Am. v. Town
of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002).  A disputed
issue is not created by a mere allegation in the pleadings, see
Applegate v. Top Assoc., Inc., 425 F.2d 92, 96 (2d Cir. 1970), or
by surmise or conjecture, see Quinn v. Syracuse Model
Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980).  Thus, "as
to issues on which the non-moving party bears the burden of
proof, the moving party may simply point out the absence of
evidence to support the non-moving party's case."  Nora
Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 742
(2d Cir. 1998).  Conclusory assertions also do not create a
genuine factual issue.  See Delaware & Hudson Ry. Co. v. Conrail,
902 F.2d 174, 178 (2d Cir. 1990).  Where affidavits are submitted
on summary judgment they "shall be made on personal knowledge,
shall set forth such facts as would be admissible in evidence,
and shall show affirmatively that the affiant is competent to
testify to the matters stated therein."  Santos v. Murdock, 243

F.3d 681, 683 (2d Cir. 2001) (quoting Rule 56(e)).

## DISCUSSION

The defendants move for summary judgment on all of Sebold's claims.  Upon review of the defendants' summary judgment briefing and statement of material facts, as well as the evidence in the record, and resolving all ambiguities and drawing all reasonable inferences in favor of the plaintiff, who is the non-moving party, the court addresses each of the defendants' arguments as set forth below.

## I.   Hostile Work Environment Under Title VII

Sebold brings a gender-based hostile work environment claim against the City under Title VII.  The City argues for summary judgment on this claim because Sebold has not put forth sufficient evidence to support this claim.  In the alternative, if Sebold has made out a claim, it argues that it is entitled to the Ellerth/Faragher affirmative defense.

### A.   Merits of Hostile Work Environment Claim

"In order to prevail on a hostile work environment claim under Title VII and the ADEA, a plaintiff must show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Terry v. Ashcroft, 336 F.3d 128, 147 (2d Cir. 2003) (internal quotations omitted).  The plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently

-26-

continuous and concerted to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal quotation omitted).  In making this inquiry, the court should look to the totality of the circumstances, including such factors as: (1) the frequency of the conduct, (2) its severity, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with an employee's work performance.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993); see Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 437 (2d Cir. 1999) (adding the consideration of "what psychological harm, if any, resulted" as a fifth factor), abrogated on other grounds, Burlington N. and Santa Fe Ry. Co. v. White, --- U.S. ----, 126 S.Ct. 2405 (2006). The Second Circuit has cautioned that district courts should consider these factors "cumulatively" so that the court can "obtain a realistic view of the work environment."  Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997) (quoting Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 444 (7th Cir. 1994)). The Second Circuit has recently warned that hostile work environment claims present "mixed questions of law and fact" that are particularly well-suited for jury determination."  Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 605 (2d Cir. 2006). This is because "[a]n Article III judge is not a hierophant of social graces and is generally in no better position than a jury

to determine when conduct crosses the line between boorish and inappropriate behavior and actionable sexual harassment." Id. (quotation and some alterations omitted).

The City argues that Sebold has not put forth evidence demonstrating conduct that is severe or pervasive enough to support a hostile work environment claim and that, despite the disputed factual issues regarding Milardo's conduct, the court can enter summary judgment on Sebold's claim as a matter of law. The court disagrees.

A jury could find that, by warning Sebold to "grow some balls," by telling her "suck it up" in dismissing her complaints about boorish behavior and sexually-demeaning jokes at Central Communications, and by insinuating that her health concerns were exaggerated or invented, Milardo made clear that he required Sebold to toughen up, i.e., act more like a man. See Petrosino v. Bell Atl., 385 F.3d 210, 224 (2d Cir. 2004) ("Indeed, Petrosino's work concerns were routinely dismissed in gender-based terms: she, like all women, was simply too 'thin-skinned' and 'sensitive' to work successfully in I & R."). When she complained about Milardo's conduct and the distasteful behavior of her coworkers, she maintains that Milardo publicly belittled her, retaliated against her with baseless discipline, physically intimidated her, and falsely accused her of leaking information in a manner that caused her to have an anxiety attack. See Fairbrother v. Morrison, 412 F.3d 39, 44, 51 (2d

Cir. 2005) (citing as conduct contributing to hostile work environment that a supervisor said to a complaining employee, "[Y]ou're not going to prevent me from . . . running the unit the way I want to run it"); Terry, 336 F.3d at 150 (finding that "racial attitudes could have exacerbated the affect of retaliation-based or age-based hostility and vice versa"). Sebold further testifies that the workplace hostility was amplified by Milardo's discriminatory and retaliatory conduct toward other women. See, e.g., Cruz, 202 F.3d at 571 (stating "[m]oreover, even if Cruz herself were not present or were not the target of some of Bloom's racial remarks, a jury plausibly could find that his persistently offensive conduct created an overall 'hostile or abusive environment'") (citing Harris, 510 U.S. at 21). This hostility, according to Sebold, continued for more than three years, beginning in July 2001, escalating in 2002 after the City settled the other gender-discrimination lawsuit, climaxing in late 2003 when Sebold filed multiple grievances, and continuing until February 2004 when Sebold left. See Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001) (finding a hostile work environment sufficiently pervasive where in "two and a half years time," the plaintiff was subjected to "offensive sex-based remarks, disproportionately burdensome work assignments, workplace sabotage, and one serious public threat of physical harm"). Ultimately, Sebold testifies that she transferred to a financially inferior position to escape Milardo's harassment.

Schiano, 445 F.3d at 606-07.  A reasonable jury could find that this conduct demonstrates "an ongoing pattern of sexually offensive and humiliating conduct" that altered the conditions of Sebold's working environment.  See id. at 606.

The intimidation, belittlement, and retaliation described by Sebold is comparable to other cases where the Second Circuit has found a hostile work environment actionable.  See, e.g., Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001) (finding a hostile work environment sufficiently pervasive where in "two and a half years time," the plaintiff was subjected to "offensive sex-based remarks, disproportionately burdensome work assignments, workplace sabotage, and one serious public threat of physical harm.").  For example, in Leopold v. Baccarat, Inc., 174 F.3d 261 (2d Cir. 1999), the Second Circuit reversed a grant of judgment as a matter of law based entirely on the plaintiff's own testimony that her supervisor had "repeatedly threatened to fire saleswomen and replace them with 'young and sexy' hires, once told a saleswomen that they were 'nothing but a bunch of pussies,' stated that he 'love[d] it when women fight,' told the plaintiff that she was in 'good shape' given her age, and commented that one of the plaintiff's co-workers was successful because she flirted with male customers."  Fairbrother v. Morrison, 412 F.3d 39, 51 n.5 (2d Cir. 2005) (quoting Leopold, 174 F.3d at 265-66), abrogated, in part, on other grounds by Kessler v. Westchester Cty. Dept. of Soc. Svcs., 461 F.3d 199 (2d

Cir. 2006).

Despite this evidence, Milardo argues that Sebold has failed to make out the third element of her hostile work environment claim because the "vast majority" of Sebold's allegations are gender-neutral. But "[f]acially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex." Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2001). Given that the record contains evidence of comments and behavior that is clearly not facially neutral – including, for example, Milardo's comments that Sebold should "grow some balls," that other female dispatchers were a "bunch of bitches," and that police officers were "pansies" – a reasonable juror could find that the facially neutral incidents described by Sebold were motivated by gender-based animus.[10] See Howley v. Town of Stratford, 217 F.3d 141, 155-56 (2d Cir. 2000) (holding

---

[10] As the Second Circuit has said, it may be proper "to allow the plaintiff to build her case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent," keeping in mind that "[t]he plaintiff must . . . establish at trial that incidents apparently sex-neutral were in fact motivated by bias." Alfano, 294 F.3d at 378. The court, however, notes that at the close of Sebold's case, to the extent that she "relies on facially neutral incidents to create the quantum of proof necessary to survive a Rule 50 motion for judgment, she must have established a basis from which a reasonable fact-finder could infer that those incidents were infected by discriminatory animus." Id.

that a fact-finder could reasonably infer that facially gender-neutral incidents were gender-based where the perpetrator had previously made sexually derogatory statements); Williams v. Gen. Motors Corp., 187 F.3d 553, 560-64 (6th Cir. 1999) (finding that gender-neutral allegations supported a hostile work environment claim because the use of gender-based slurs in some incident justified the inference that all of the incidents were gender-based).

The court also rejects the City's argument that the harassment was wholly unrelated to gender because Sebold admits that Milardo treated her well until 2001, when she began dating a police officer, whom Milardo did not like. While the record permits this inference, (see, e.g., Pl. Dep. 218:8-219:1) (describing personal animosity between Milardo and Sebold's husband), other evidence clouds its certainty. Sebold states that Milardo was nice to her prior to 2001 during a time when the City wished her to sign a waiver absolving the City from liability for filling her position while she was on FMLA leave. Further, Sebold's testimony that the harassment increased after the other dispatchers settled their gender-discrimination lawsuit permits an inference that Milardo toned down his behavior while the lawsuit was pending.

In short, the uncertainty surrounding these allegations prevents the court from deciding, as a matter of law, that the harassment Sebold describes was wholly unrelated to gender.

Feingold v. New York, 366 F.3d 138, 151 (2d Cir. 2004) ("These are the types of factual questions, however, that must be resolved by a jury, rather than by a court at summary judgment.").

        B.   The City's Liability for Milardo's Conduct

In the alternative, the City argues that it cannot be liable for Sebold's hostile work environment claim because none of the "harassing conduct can fairly be imputed to the employer for purposes of assessing liability." Petrosino, 385 F.3d at 224. The Supreme Court has held that employers are not automatically liable for gender-based harassment by their supervisors under the so-called Ellerth/Faragher defense. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998). The court first addresses whether the City may assert this defense.

        1).   Availability of Ellerth/Faragher Defense

The City argues that it is entitled to assert the Ellerth/Faragher defense because Sebold did not suffer a tangible employment action. Sebold, however, argues that Milardo's conduct constituted a constructive discharge. The court disagrees and finds that the City may assert this defense.

"Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior culminated in a tangible employment action against the employee; if it did,

-33-

the employer will, _ipso facto_, be vicariously liable."
_Petrosino_, 385 F.3d at 224 (internal citation and quotations
omitted).

A voluntary transfer can constitute an adverse employment
action if it amounts to a constructive discharge.[11] _Chanval
Pellier_, 2006 WL 132073, at *5 (citing _Lopez v. S.B. Thomas,
Inc._, 831 F.2d 1184, 1188 (2d Cir. 1987); _accord_ _Simpson v.
Borg-Warner Auto., Inc._, 196 F.3d 873, 876-78 (7th Cir. 1999)
(holding that voluntary transfer was not an adverse employment
action where the work environment was not intolerable and
assessing voluntariness under "constructive discharge" analysis).

"Constructive discharge of an employee occurs when an employer,
rather than directly discharging an individual, intentionally
creates an intolerable work atmosphere that forces an employee to
quit involuntarily.  Working conditions are intolerable if they
are so difficult or unpleasant that a reasonable person in the
employee's shoes would have felt compelled to resign."  _Chertkova
v. Conn. Gen. Life Ins. Co._, 92 F.3d 81, 89 (2d Cir. 1996).

Sebold's evidence, however, fails to demonstrate the
intolerable work atmosphere required for a finding of

---

[11]  Sebold's transfer, without more, cannot serve as a
tangible employment action because she voluntarily requested and
accepted it.  _Chanval Pellier v. British Airways, Plc._, No.
Civ.A. 02-CV-4195, 2006 WL 132073, at *5 (E.D.N.Y. Jan. 17,
2006).

constructive discharge.[12]  Despite the alleged harassment, Sebold

"was not being threatened with immediate discharge, demotion, or

a cut in pay, and her duties had not been changed." <u>Alfieri v.

SYSCO Food Svrs.</u>, 192 F. Supp. 2d 14, 24 (W.D.N.Y. 2001) (finding

no constructive discharge).  Even Milardo's harassment, as

described by Sebold, was aimed at forcing Sebold to accept his

authority and the hostile environment, not force her to quit.

<u>Cf., e.g.</u>, <u>Chertkova v. Connecticut General Life Insurance Co.</u>,

92 F.3d 81, 85-89 (2d Cir. 1996) (finding that the plaintiff had

been constructively discharge where the plaintiff's supervisors

"called [the plaintiff] into an office with closed doors and

berated and yelled at [her] for hours;" placed the plaintiff on

formal probation[;] and threatened that "she would be fired

immediately if, over the course of two years, she did not

maintain satisfactory performance levels, demonstrate

satisfactory behavior, and improve her listening skills"); <u>Lopez

v. S.B. Thomas, Inc.</u>, 831 F.2d 1184, 1188 (2d Cir. 1987) (finding

a constructive discharge claim where defendant told plaintiff "he

would be fired at the end of the 90-day probationary period no

matter what he did to improve his allegedly deficient

_____

[12]  Because constructive discharge is considered an
aggravated form of hostile work environment, there is nothing
inconsistent about the court's finding that Sebold has made out a
claim of hostile work environment but not a constructive
discharge.  <u>See, e.g.</u> <u>Whidbee v. Garzarelli Food Specialties,
Inc.</u>, 223 F.3d 62, 74 (2d Cir. 2000) (denying summary judgment to
defendants on plaintiff's hostile work environment claim but
granting summary judgment on their constructive discharge claim).

performance").

As the Supreme Court has stated, constructive discharge represents a "'worse case' harassment scenario, harassment ratcheted up to the breaking point." Pennsylvania State Police v. Suders, 542 U.S. 129, 147-48 (2004). However, the conditions described by Sebold were not so dire, even if they might constitute a hostile work environment. See Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360 (2d Cir. 1993) (finding no constructive discharge where a plaintiff alleged he was "ridiculed by his supervisor, . . . harangued by executives, . . . and suffered high blood pressure as a result of his supervisor's treatment"). Indeed, Sebold endured the environment at Central Communications for over two years, between July 2001 and August 2003, before she requested a transfer. After that request, she continued working at Central Communications for seven more months. Given the amount of time she endured Milardo's alleged hostility, a reasonable jury could not find that the conditions in Central Communications were so intolerable that a reasonable person would have considered the transfer her only alternative. See Cecil v. U.S. Postal Serv., 03 Civ. 8404(JSR), 2004 WL 1886202, at *2 (S.D.N.Y. Aug. 24, 2004) ("[T]he fact that nearly a year passed between the start of [plaintiff's] sick leave and [her] date of retirement 'makes it less likely that the resignation was prompted by an atmosphere so intolerable that a reasonable person would have felt compelled to

resign.'") (quoting <u>Katz v. Beth Israel Med. Ctr.</u>, 95 Civ. 7183, 2001 WL 11064, at *12 (S.D.N.Y. Jan. 4, 2001)).

While Sebold takes issue with the manner in which the City investigated her complaints and failed to transfer her to a suitable position, she has not put forth any evidence that the City or Thornton deliberately acted to force her to resign. "[I]neffective or even incompetent . . . handling of the matter [by an employer] . . . does not rise to the level of deliberate action required by [Second Circuit] precedent." <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 74 (2d Cir. 2000). Putting aside Sebold's speculation, the evidence demonstrates that the City eliminated the budget analyst position, as well as every other budget analyst position in the City, for fiscal reasons. Sebold does not dispute that the City's charter gave Thornton unilateral authority to eliminate the position or that the elimination of the position was also approved by the City's common council. While Sebold claims that the City improperly required her to test for the budget analyst position, she does not provide any support for her claim. She also provides no evidence that the City withheld favorable positions. Rather, the undisputed evidence shows that, of the three positions she applied for, one was filled by an in-house person and the others she declined for her own subjective reasons.

Further, a jury could not reasonably find constructive

discharge where Sebold failed to fully take advantage of available grievance procedures provided by the CBA.  See Larkin v. Town of Hartford, 891 F. Supp. 719, 728-29 (D. Conn. 1995) (noting that "a reasonable employee will usually explore . . . alternative avenues thoroughly before coming to the conclusion that [transfer or resignation] is the only option"), aff'd 101 F.3d 109 (2d Cir. 1996).  The undisputed evidence demonstrates that Sebold ultimately abandoned all of her grievances.[13]

For these reasons, the court finds that Sebold did not suffer a constructive discharge, which would constitute a tangible employment acting precluding the City from advancing the Ellerth/Faragher defense.  The court now turns to whether the court can rely on this defense to enter summary judgment.

### 2). Adequacy of the City's Response to Sebold's Complaints

The City further argues that summary judgment should enter because it reasonably responded to Sebold's complaints and that she delayed too long in filing a grievance.  Sebold responds that the City failed to properly investigate her complaints, precluding summary judgment on this issue.  The court finds that disputed issues of material fact present the court from concluding as a matter of law that the City's response was adequate.

---

[13]  To the extent that Sebold intends to bring a separate constructive discharge claim, the court enters summary judgment on this claim for the reasons given herein.

Where an employee has not suffered a tangible employment action, "an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and (b) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" Petrosino, 385 F.3d at 225 (quoting Ellerth, 524 U.S. at 765).

The City maintains that summary judgment is warranted on this issue because the evidence indicates it exercised reasonable care by establishing policies and procedures to prevent and address harassment, including an anti-harassment policy and a three-step complaint procedure under the CBA, and that Sebold did not file a formal complaint as required under its procedures until 2003, two years after she says the harassment began; and it conducted two separate investigations and both found no evidence of improper conduct by Milardo.

Sebold, however, points to her letter noting factual inaccuracies in Moore's report; that Milardo claimed to have the administration "in his pocket;" her testimony that Thornton publicly announced that she had exonerated Milardo of Sebold's charges; that when Sebold complained to Jackson about Milardo's harassment, Jackson shrugged her shoulders to indicate that

nothing could be done and said that Milardo is not going anywhere; and that Moore and Jackson tried to dupe her into waiving her grievances. Further, Sebold testifies that she delayed in taking advantage of the City's complaint procedures because Milardo made clear to his employees that, if they complained, he would retaliate against them and that complaints would be futile.[14]

Given these disputed version of events and competing allegations, the court cannot award summary judgment on this issue. In order to decide in favor of the City on this point, the court would have to choose between disputed accounts of what occurred and engage in credibility determinations that are inappropriate on a motion for summary judgment. See Petrosino, 385 F.3d at 225-26; Cruz, 34 F.3d at 1155.

In sum, Sebold has presented sufficient evidence to allow her Title VII hostile work environment claim to go to the jury, and the disputed factual issues relating to whether the City adequately addressed her claims renders summary judgment on the Ellerth/Faragher defense inappropriate.

## II. Hostile Work Environment under the ADEA

Sebold also brings an age-based hostile work environment claim against the City under the ADEA. The City raises the same

---

[14] Moreover, according to a favorable reading of Sebold's allegations, the harassment did not reach its peak until mid to late 2003. During that time, she filed numerous grievances.

arguments that it raised in support of summary judgment on Sebold's gender-based hostile work environment claim.  In particular, the City argues that Sebold has not alleged sufficient facts to support an age-based hostile work environment claim because none of Milardo's conduct was severe or pervasive.

The court finds that, unlike Sebold's gender-based hostile work environment claim, she has not demonstrated an "objectively hostile or abusive work environment" based upon her age. Petrosino, 385 F.3d at 221.  The standard for hostile work environment under the ADEA is the same as under Title VII. Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999).  Sebold's allegations as to age-based animus consist of three off-hand comments, two by Milardo, one of which Sebold admits was not intended to be age-based, and repeated statements by a coworker that she was old.  These allegations are neither sufficiently severe or pervasive to support a claim of an age-based hostile work environment.  Cf., e.g., Kassner v. 2nd Ave. Delicatessen Inc., --- F.3d. ---, 2007 WL 2119769, at *6 (2d Cir. Jul. 24, 2007) (finding that an allegation of "continued harassment," including statements by a supervisor and several of his subordinates such as "drop dead," "retire early," "take off all of that make-up," and "take off your wig") (internal quotations omitted).  The record also does not indicate that these age-related comments were either physically threatening or humiliating or interfered with her work performance.  Moreover,

Sebold does not allege that she witnessed either Milardo or her coworkers humiliate, retaliate against, or deride other older persons. Finally, given this lack of age-based animus attributable to Milardo, the record does not support an inference that his age-neutral actions, such as his conduct during the Anxiety Attack Incident, were "based on her age." <u>Brennan</u>, 192 F.3d at 318.

For these reasons, the court finds that summary judgment is appropriate on Sebold's ADEA hostile work environment claim against the City.

III. <u>Discrimination under Title VII and the ADEA</u>

In addition to the hostile work environment claims, Sebold brings discrimination claims against the City under Title VII and the ADEA. Specifically, she claims that she was treated differently than her younger and male colleagues and that such treatment resulted in discipline and her transfer to a monetarily inferior position in the tax assessor's office. The City argues that she neither has made out a prima facie case of discrimination nor disproved its legitimate nondiscriminatory reasons for the actions taken against her. The court agrees.

Title VII makes it unlawful for an employer "to fail or refuse to hire . . . any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA makes it unlawful for an employer "to fail or refuse to hire . . . any individual . . .

because of such individual's age." 29 U.S.C. § 623(a)(1). The same evidentiary framework governs claims of age and sex discrimination claims under both Title VII and the ADEA. Byrnie v. Town of Cromwell, 243 F.3d 93, 102 (2d Cir. 2001).

Sebold must initially establish, by a preponderance of the evidence, a prima facie case of discrimination: "(1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006).

The court assumes for purposes of this motion that she has demonstrated the first two prongs of her prima facie case — that she is a woman over the age of forty and that her job performance was satisfactory, despite the disciplinary actions taken against her. The court, however, finds that Sebold has not come forward with sufficient evidence as to the third prong – whether she suffered an adverse employment action – to defeat summary judgment.

Sebold argues that the following adverse employment actions support her claim: (1) the disciplinary actions against her during the Paid Leave, Portland, and Neighbor Incidents; (2) the fact that she was less trained on how to dispatch the fire department than her male colleagues; and (3) the transfer to the tax assessor's office at a salary of $22,000 less per year. None

of these, however, constitute an adverse employment action as a matter of law.

First, the disciplinary actions cannot, in this instance, constitute an adverse employment action because the warnings were not "materially adverse," that is, they were not "more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabya v. New York City Bd. of Ed., 202 F.3d 636, 640 (2d Cir. 2000) (quotation omitted). In the context of a discrimination claim, "[a] change that is 'materially adverse' could consist of, inter alia, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Kassner, 2007 WL 2119769, at *4. Here, Sebold has not put forth any evidence that these disciplinary actions altered her employment. While the CBA permitted Milardo to rely on previous warnings to subject Sebold to "progressive discipline," meaning he could have disciplined her more harshly for past discipline, she does not put forth any evidence that this occurred.

This finding is consistent with other courts, which have found that written reprimands do not result in materially adverse changes in the terms and conditions of an employee's employment. See, e.g., Weeks v. New York State, 273 F.3d 76, 86 (2d Cir. 2001), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); Evarts v. So. New England Tel.

Co., No. 3:00-cv-1124(WIG), 2006 WL 2864716, at *11 (D. Conn. Oct. 2, 2006) (concluding that a "verbal warning . . ., the lowest form of discipline and the first step in a four-step process outlined in the Collective Bargaining Agreement" was not an adverse employment action).

Second, Sebold's lack of training on how to dispatch the fire department cannot constitute an adverse employment action because it did not affect her employment.  Courts have found that denying an employee training opportunities can be an adverse employment action where those opportunities are necessary for advancement or other benefits, see, e.g., Ewing v. Coca Cola Bottling Co. of N.Y., Inc., No. 00-7020, 2001 WL 767070, at *6 (S.D.N.Y. June 25, 2001), but nothing in the record indicates that is the case here.  Even if this could support her discrimination claim, there is no evidence in the record that her lack of training gives rise to an inference of discrimination. She does not point to any other similarly situated males or younger persons who were granted this training opportunity while she was not.  Indeed, Sebold admits in her deposition that Milardo gave Sebold the lead dispatcher position with the knowledge that she was unfamiliar with how to dispatch the fire department because, according to him, she could simply assign a properly trained person to that position during her shift.

Third, Sebold's transfer did not constitute an adverse employment action because she voluntarily requested it.  While an

employee can make out an adverse employment action supporting a prima facie case of discrimination based on evidence that a more desirable, lateral job opening for which the employee was qualified may have existed but was not offered to the employee, see Richardson, 180 F.3d at 444 n.4, the undisputed evidence here is that the budget analyst position was ultimately unavailable because it was eliminated. Even if the elimination of this position could support Sebold's prima facie case, there is no indication in the record that Thornton, Moore, or Jackson acted out of gender- or age-based discriminatory animus. Moreover, Sebold has not put forth any evidence to disprove the City's reasons for eliminating the budget analyst position or otherwise show that its reason was pretextual.

To the extent that Sebold premises her Title VII and ADEA discrimination claims on her allegations that she was constructively discharged, which can be an adverse employment action, the court has already concluded that Sebold has not established constructive discharge as a matter of law. Therefore, she has not made out any adverse employment action supporting her discrimination claims.

For these reasons, summary judgment on Sebold's Title VII and ADEA discrimination claims against the City is warranted.

IV. <u>Retaliation Under Title VII & State Law</u>

Sebold brings retaliation claims under Title VII and Conn. Gen. Stat. § 46a-60(a)(4) against the City, Milardo, and

Thornton, alleging that after she complained to the human resources office and the mayor about gender discrimination and hostile work environment, Milardo retaliated against her by subjecting her to meritless discipline.  Sebold does not clearly explain how Thornton retaliated against her.

Before addressing the defendants' arguments in support of summary judgment, the court must address whether Sebold can allege her state-law retaliation claim against Milardo and Thornton where she did not receive a release of jurisdiction.

A.    Failure to Obtain a Release of Jurisdiction from the CHRO

Milardo argues that under Conn. Gen. Stat. § 46a-101, a court cannot entertain a CFEPA claim if the plaintiff failed to obtain a release of jurisdiction from the CHRO.  At oral argument, Sebold's counsel argued that, based on his experience, a right to sue letter from the EEOC, which Sebold received, is sufficient to satisfy the exhaustion requirements of § 46a-101. Sebold's counsel, however, failed to provide the court with any authority to support this contention and the court has not found any.

The CFEPA "does not provide an unconditional private right of action for claimants" and instead requires a plaintiff to exhaust certain administrative requirements before bringing suit. Sullivan v. Bd. of Police Comm'n, 196 Conn. 208, 216 (1985).  A plaintiff who fails "to follow the administrative route that the

legislature has prescribed for his claim of discrimination, lacks
the statutory authority to pursue that claim . . . ." Id.  A
complainant who receives a final order of dismissal from the CHRO
may appeal to the Superior Court.  See Conn. Gen. Stat.
§ 46a-94(a).  A complainant may also file an original action with
the Superior Court pursuant to Conn. Gen. Stat. §§ 46a-100 and
46a-101.  Section 46a-100 provides that "[a]ny person who has
timely filed a complaint with the Commission on Human Rights and
Opportunities in accordance with Section 46a-82 and who has
obtained a release from the commission in accordance with Section
46a-83a or 46a-101, may also bring an action in the Superior
Court for the judicial district in which the discriminatory
practice is alleged to have occurred . . . ."  Conn. Gen. Stat. §
46a-100 (emphasis added).  Section 46a-101(a) further provides
that "[n]o action may be brought in accordance with Section
46a-100 unless the complainant has received a release from the
commission . . . ."  Conn. Gen. Stat. § 46a-101(a); see Brightly
v. Abbott Terrance Health Ctr., Inc., No. CV980148584S, 2001 WL
256228, at *3 (Conn. Super. Ct. Feb. 27, 2001) (holding that "§§
46a-100 and 46a-101(a) are mandatory and require the plaintiff to
obtain a release from the CHRO prior to initiating a private
cause of action under the CFEPA").  Simply put, an employee "can
only bring a civil action against the [employer] if she requests
and obtains a release from the commission."  Angelsca Prods.,
Inc. v. Comm'n on Human Rights & Opportunities, 248 Conn. 392,

405 (1999).

Here, because Sebold has not demonstrated that she has exhausted her administrative remedies or obtained a release of jurisdiction, the court cannot entertain her claims under the CFEPA.  While Sebold argues that the right-to-sue letter she received from the EEOC is sufficient to exhaust her administrative remedies under the CFEPA, this argument has no merit.  A "right to sue letter from the EEOC . . . does not permit a person to file a claim with the Superior Court on an employment discrimination cause of action without a release of jurisdiction from the CHRO. . . . [because] [t]he right to sue from the EEOC has no legal significance under [the CFEPA]." Dichello v. Marlin Firearms Co., No. CV065002796S, 2007 WL 429301, at *4 (Conn. Super. Ct. Jan 22, 2007) (dismissing CFEPA claim where an employee alleged that EEOC right-to-sue letter satisfied the CFEPA's exhaustion requirement); see also Catalano v. Bedford Assoc., Inc., 9 F. Supp. 2d 133, 135 n.1 (D. Conn. 1998) (holding that a "'right to sue' letter from the Equal Employment Opportunity Commission does not exhaust the administrative remedies in Title 46a of the General Statutes"). Under similar circumstances, this court has refused to find that an EEOC right-to-sue letter exhausted the CFEPA's requirements. Aukstolis v. Ahepa 58/NATHAN Hale Senior Ctr., No. 3:07CV51(JCH), 2007 WL 1341235, at *4 (D. Conn. May 4, 2007) (noting the work-sharing agreements between the CHRO and the EEOC, but finding

that an EEOC right-to-sue letter did not exhaust CHRO administrative requirement of release of jurisdiction); <u>Nader v. Brunalli Const. Co.</u>, No. 3:98CV2085(CFD), 2002 WL 724597, at *5, *12 (D. Conn. March 26, 2002) (dismissing a CFEPA claim for lack of subject matter jurisdiction, even where the plaintiff received right-to-sue letter from the EEOC).[15]

Accordingly, Sebold's discrimination claims under the CFEPA are dismissed.

## B. Title VII Retaliation Claim

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  "In order to establish a prima facie case of retaliation, [Sebold] must show that: (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal

_____

[15]  Sebold's counsel has not even alleged, either in his papers or at oral argument, that he made a good faith effort to comply with the CFEPA's prerequisites.  <u>See</u> <u>Williams v. Comm'n on Human Rights and Opportunities</u>, 257 Conn. 258 (2001).  For example, the record does not reflect when the CHRO issued its decision or that he requested a release of jurisdiction within 15 days of that decision, as required by Conn. Gen. Stat. § 46a-83a(b).  <u>See</u> <u>Nader</u>, 2002 WL 724597, at *12 n.6; <u>see</u> <u>also</u> <u>Bogle-Assegai v. Connecticut</u>, 470 F.3d 498, 504-05 (2d Cir. 2006).

connection exists between the alleged adverse action and the protected activity." Schiano, 445 F.3d at 608.

The City does not dispute that Sebold engaged in a protected activity when she complained and filed grievances alleging that Milardo harassed and discriminated against her on the basis of her gender; nor does the City contest that it was aware of her complaints. It does, however, contest the remaining two elements of the Sebold's prima facie case – that she suffered an adverse employment action and that a causal connection exists between any adverse employment action and her complaints.

### 1). Adverse Employment Action

Sebold alleges that she suffered adverse employment actions when she was subjected to a series of baseless disciplinary events. In support of this claim, Sebold testifies that after she complained she "started getting . . . all these warnings and stuff, and then the Loudermill hearing . . . ." (Pl.'s Dep. at 177:13-14). Nonetheless, the court views the evidence in the light most favorable to Sebold and concludes that those baseless disciplinary events consist of (1) a warning Milardo gave her for insubordination following the Paid Leave Incident; and (2) two warnings Milardo gave her for failing to supervise subordinate dispatchers following the Neighbor and Portland Incidents.

The Supreme Court has recently stated that an adverse employment action supporting a Title VII retaliation claim is one that is "materially adverse," that is, "it might well have

dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 126 S. Ct. at 2415. Thus, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Kessler, 461 F.3d at 209.

Under this standard, a jury could find that the warnings Sebold received, especially the warning for insubordination during the Paid Leave Incident, would dissuade a reasonable employee from complaining about Title VII violations. The CBA provides that warnings, either oral or written, could lead to progressive discipline for future infractions, including suspension and termination. (See Milardo's Mot. for Summ. J. Ex. 4 (describing disciplinary procedure under CBA); Pl.'s Dep. at 176:21-24 ("I guess it starts with a consultation or a verbal warning or – and then progresses to a written warning, a suspension, a termination, you know, whatever, something in that order.")). In short, these disciplinary actions are more than "petty slights" and "minor annoyances," Burlington Northern, 126 S. Ct. at 2414-15, because they have the potential to threaten a City employee's future employment.[16]

---

[16] This finding is not inconsistent with the court's conclusion that, under her claim for discrimination, Sebold did not suffer an "adverse employment action" because the standard for "adverse employment action" under a retaliation claim is less stringent than under a discrimination claim. See Evarts, 2006 WL 2864716, at 8 n.12.

Further, the Second Circuit has recently equated the adverse employment action requirement for a First Amendment retaliation claim with the adverse employment action requirement for a Title VII retaliation claim.  Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 227 (2d Cir. 2006) ("Our standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in Burlington Northern.")  Thus, there is no difference between what constitutes an adverse employment action under claims of either First Amendment retaliation or Title VII retaliation.  The Second Circuit has repeatedly said, in the context of First Amendment retaliation claims, that "[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."  Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) (emphasis added).  Indeed, "institution of disciplinary proceedings is sufficient in this circuit to constitute an adverse employment decision."  Skehan v. Vill. of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006).

Thus, consistent with the case law in this circuit, the court finds that a reasonable person in Sebold's position could be dissuaded from complaining about discrimination by her supervisor after being subsequently disciplined by that supervisor.  See, e.g., Douglas v. City of Waterbury, No. 3:05CV01051(DJS), 2007 WL 1880293, at *12 (D. Conn. June 29, 2007) (finding that a supervisor's documentation of instances of

insubordination could constitute an adverse employment action).[17]

There is no merit to the City's argument that the warnings could not have been materially adverse because Sebold continued to complain after she was disciplined.  As the City notes, the test for material adversity is objective, not subjective. Kessler, 461 F.3d at 201, 209.  Furthermore, to the extent that the Second Circuit's standards are the same for Title VII and First Amendment retaliation, there is no requirement that an employee actually be "chilled" by an employer's adverse action. Rather, "it is well-settled that public employees alleging retaliation for engaging in protected speech are not normally required to demonstrate a chill subsequent to the adverse action taken against them."  Morrison v. Johnson, 429 F.3d 48, 51 (2d Cir. 2005) (quoting Gill v. Pidlypchak, 389 F.3d 379, 382 (2d Cir. 2004)) (emphasis omitted).  Thus, the only inquiry as to whether Sebold suffered an adverse employment action is whether a "reasonable person" would have been dissuaded by the discipline, not whether Sebold was actually dissuaded.  Cf. Burlington Northern, 126 S. Ct. at 2409, 2416-17 (finding an employer's conduct materially adverse where the employee filed a subsequent charge of retaliation).

---

[17]  While the City cites cases in which warnings were found to be insufficient to support a retaliation claim, see, e.g., Weeks, 273 F.3d at 86, those cases were decided prior to Burlington Northern and are therefore not controlling.

2). <u>Causation</u>

The City alternatively argues that Sebold has not demonstrated a causal link between her complaints against Milardo and her subsequent discipline. Contrary to the City's argument that direct evidence of this causal link is required, proof of causation can be shown "indirectly, by showing that the protected activity was followed closely by discriminatory treatment." <u>Gordon v. New York City Bd. of Ed.</u>, 232 F.3d 111, 117 (2d Cir. 2000).

Here, the record permits an inference of a causal link between the complaints and the alleged retaliation based upon the temporal proximity of these events. The evidence indicates that Milardo disciplined Sebold for insubordination in the midst of a series of complaints about his conduct. <u>See, e.g.</u>, <u>Gordon</u>, 232 F.3d at 117. In the month before Milardo conducted the Loudermill hearing for Sebold's insubordination during the Paid Leave Incident, Sebold complained to Thornton and Moore about his alleged harassment; Thornton reinvestigated Milardo based on Sebold's allegations; and Sebold filed a Step 1 grievance, stating that her "supervisor created a hostile work environment causing employee physical harm" and her "[w]orkplace continues to present discriminatory practices." (The City's Mot. for Summ. J., Ex. J). Then, shortly before Milardo issued her warning for her insubordination on October 15, 2003, citing her lack of "remorse," Sebold sent letters to Jackson and Thornton

complaining about his conduct and filed a Step 1 grievance for his alleged harassment during the Paid Leave Incident. Similarly, in the days before Milardo disciplined Sebold for her involvement in the Neighbor and Portland Incidents, she filed a grievance for his allegedly harassing behavior during the Documents Incident.

Thus, Sebold has alleged enough evidence to establish the last element of her prima facie case of discrimination.

### 3). Legitimate, Non-retaliatory Reason for the Discipline and Pretext

The City further argues that, even if Sebold presented enough evidence to establish a prima facie case, she has not put forth any evidence to disprove its legitimate, non-retaliatory reasons for disciplining her. The court disagrees.

"A retaliation claim follows the familiar burden-shifting framework developed to evaluate allegations of disparate treatment." Juke v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). Once a plaintiff has made out a prima facie case of retaliation, the burden shifts to the defendant to show a legitimate, non-retaliatory reason for the termination. Id. Once that is proved, the burden then shifts back to the plaintiff to show that retaliation "was a substantial reason for the adverse employment action." Id. In order to prove that the City's explanations for the alleged acts of retaliation are pretextual, Sebold must show "both that the reason was false, and

that [retaliation] was the real reason."  St. Mary's Honor Ctr.
v. Hicks, 509 U.S. 502, 515 (1993).

Here, the City alleges that Sebold was disciplined for
insubordination, that is, refusing to follow Milardo's directive
to account for her absence from Central Communications while she
attended a workers' compensation hearing.  As to the warnings she
received for her conduct during the Neighbor and Portland
Incidents, the City alleges that she, as lead dispatcher on duty,
failed to properly supervise the subordinate dispatchers during
these incidents, and therefore, disciplinary action was
warranted.

Sebold, however, disputes the legitimacy of the City's
proffered reasons.  She maintains that her write-up for
insubordination was baseless, especially in light of the fact
that Sebold was ultimately correct that she should not be
required to take personal leave to attend the worker's
compensation hearing.  Indeed, the City admits that Sebold was
improperly required to take personal leave to attend the hearing
and ultimately restored her leave on December 5, 2003.  While the
defendants claim that discipline for insubordination is
permissible under the CBA and necessary to the effective running
of Central Communications, an issue of fact remains as to whether
such discipline was necessary in this instance.

With regard to the Portland Incident, Sebold maintains that,
although she called an ambulance to respond to the accident, she

was not on dispatching duty during that shift and was only at Central Communications in another area for training. (Pl.'s Dep. at 423:9-25). While Milardo cited Sebold's failure to dispatch the fire department, Sebold testifies she was never trained on this aspect of her job and that Milardo offered her the lead dispatcher position with the understanding that, even though she did not know how to dispatch the fire department, she could assign other people to do so. Given these disputed issues of fact, the court cannot say that a reasonable juror could not discredit the City's reasons for these warnings.

Moreover, Sebold has presented sufficient evidence of retaliatory intent on behalf of Milardo to allow a reasonable juror to infer that Milardo was motivated, in part, to punish Sebold for her complaints. Aside from the evidence that she had an unblemished record for thirteen years until she began complaining against Milardo, she points to numerous instances where Milardo made clear that he would retaliate against those who opposed him, including ridiculing and spying on the plaintiff-dispatchers, pledging he would "take . . . out" a female police sergeant, and keeping tapes of inappropriate comments made by police officers over the dispatch airwaves. While Milardo denies that he made these comments and took these actions, his denials show that there is a genuine factual issue that must be left to the jury to resolve.

For these reasons, the court denies the City's motion for

summary judgment on Sebold's Title VII retaliation claim.

V.   Aiding and Abetting Discrimination Under Conn. Gen. Stat. § 46a-60(a)(5)

Sebold claims Milardo and Thornton aided and abetted "the doing of any act declared to be a discriminatory employment practice or to attempt to do so" in violation of Conn. Gen. Stat. § 46a-60(a)(5).  Because Sebold failed to exhaust her administrative remedies as to her CFEPA claims, as discussed above in the context of her retaliation claim, summary judgment is granted.

VI.  Section 1983 Equal Protection Claims

Sebold claims that Milardo and Thornton violated her Fourteenth Amendment right to equal protection under three different theories.  Specifically, she alleges Milardo and Thornton subjected her to a hostile work environment, "class of one" discrimination, and selective enforcement discrimination.

A.   Section 1983 Hostile Work Environment

Sebold claims that Milardo and Thornton violated her Fourteenth Amendment right to equal protection by subjecting her to a hostile work environment based on gender discrimination.[18] Both defendants argue that they are entitled to qualified

---

[18]   To the extent that Sebold intended to bring a hostile work environment claim against Milardo and Thornton based upon age-based animus, the court considers that claim waived because Sebold only claims that "the conduct of the defendant Milardo was . . . based upon the plaintiff's gender."  (Pl.'s Opp'n to Mots. for Summ. J. at 52).

immunity against these individual capacity claims.[19]

### 1). Milardo

Milardo claims that he is entitled to qualified immunity on Sebold's § 1983 hostile work environment claim because it was not clear to him that he had created a hostile work environment under the complicated and fact-intensive legal framework. The court, however, finds that he is not entitled to qualified immunity.

"Qualified immunity protects government officials from civil liability when performing discretionary duties 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Demoret, 451 F.3d at 148-49 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In determining the applicability of the qualified immunity defense, the court must first determine whether, according to the plaintiff's allegations, the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). If "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id. "A defendant is entitled to qualified

_____

[19]  To the extent that Sebold intends to bring a § 1983 claim based on hostile work environment against Milardo and Thornton in their official capacities, the court dismisses this claim as duplicative of her Title VII and ADEA hostile work environment claims against the City. Sims v. Unified Gov. of Wyandotte County/Kansas City, Kan., 120 F. Supp. 2d 938, 944 (D. Kan. 2000); see Hafer v. Melo, 502 U.S. 21, 25 (1991).

immunity only if he can show that, viewing the evidence in the light most favorable to [the] plaintiff[], no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law." Demoret, 451 F.3d at 148 (citing Ford v. Moore, 237 F.3d 156, 162 (2d Cir. 2001)). "In other words, government officials will be immune from liability if they can establish that it was objectively reasonable for them to believe their actions were lawful at the time." Id. at 148-49 (citing Moore, 371 F.3d at 114).

Based on the reasons discussed above, Sebold has presented sufficient facts to permit a reasonable jury to conclude that Milardo violated her equal protection rights by subjecting her to a hostile work environment based upon gender.[20]  Given that the law regarding hostile work environment is clearly established, a reasonable jury also could conclude based on those facts that Milardo acted unreasonably.  See, e.g., Thompson v. Conn. State Univ., 466 F. Supp. 2d 444, 455 (D. Conn. 2006).  There is no authority to support Milardo's argument that he is entitled to qualified immunity because the application of the hostile work environment claim was too "complicated" for him to know that his conduct was prohibited.

_____

[20]  The same standards govern whether a plaintiff has demonstrated a hostile work environment under Title VII and § 1983.  Demoret, 451 F.3d at 149; Patterson v. County of Oneida, New York, 375 F.3d 206, 226 (2d Cir. 2004) (stating that § 1983 claims alleging discrimination are analyzed under Title VII's standards).

For these reasons, Milardo is not entitled to qualified immunity on this claim.

### 2). <u>Thornton</u>

Thornton also argues that she is entitled to qualified immunity because she was not deliberately indifferent to Sebold's complaints about Milardo's harassment.  The court agrees that this claim should be dismissed.

Because Sebold does not describe the nature of her individual capacity hostile work environment claim against Thornton and because she does not put forth any evidence that Thornton directly acted to create her hostile work environment, the court assumes that Sebold claims that Thornton was deliberately indifferent to the hostile work environment Sebold suffered under Milardo.  "Deliberate indifference to discrimination can be shown from a defendant's actions or inaction in light of known circumstances." <u>Gant v. Wallingford Bd. of Educ.</u>, 195 F.3d 134, 140-141 (2d Cir. 1999).  "The ultimate inquiry, of course, is one of discriminatory purpose on the part of the defendant [herself].  Thus, to establish a violation of the Equal Protection Clause . . ., a plaintiff must show that the defendant's indifference was such that the defendant intended the discrimination to occur."  <u>Id.</u>

Sebold has not provided sufficient evidence to show that Thornton deliberately intended that Milardo subject her to a hostile work environment.  The undisputed evidence in the record

indicates that after Sebold made Thornton aware of Milardo's alleged conduct, Thornton assigned Moore and Jackson to conduct two separate investigations. Based on these investigations, which found no evidence of Milardo's harassment, Thornton concluded she could not transfer Sebold to a budget analyst position without violating the terms of the CBA.

Although Sebold asserts that Milardo's harassment began in 2001, she submits no evidence demonstrating that Thornton knew about Milardo's alleged harassment until August 2003. And while Sebold generally disputes Thornton's claim that the CBA prohibited her from transferring Sebold, she does not put forth any evidence supporting this conclusion, much less point to any language in the CBA that would have authorized Thornton to transfer her absent an open position.

For these reasons, Thornton is entitled to qualified immunity on Sebold's gender-based hostile work environment claim

under § 1983.[21]

      B.   Class of One & Selective Enforcement Claims

Sebold also alleges that her equal protection claim is premised on "class of one" discrimination under <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562 (2000), and selective enforcement under <u>LeClair v. Saunders</u>, 627 F.2d 606, 609 (2d Cir. 1980), against Milardo and Thornton. They argue that Sebold has no evidence that she was similarly situated to any other employees at Central Communications to sustain these claims. The court agrees.[22]

Under a "class of one" claim, a plaintiff must show that: "(I) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to

_____

[21] The court also grants summary judgment as to Milardo and Thornton to the extent Sebold brings retaliation claims against them pursuant to § 1983 based on violations of the Fourteenth Amendment. The Second Circuit has refused to recognize a claim for retaliation based on the Fourteenth Amendment under § 1983. <u>Bernheim v. Litt</u>, 79 F.3d 318, 323 (2d Cir. 1996) ("[W]e know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination. Given the availability of Title VII, . . . , we see no reason to break new constitutional ground in this case.").

[22] To the extent that Sebold brings class of one and selective enforcement claims against Milardo and Thornton in their official capacities, i.e., against the City, the court dismisses these claims for the reasons given herein.

exclude the possibility that the defendant acted on the basis of a mistake." Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005). The Second Circuit has stated that "[i]n order to succeed on a 'class of one' claim, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." Id. at 204 (quotation and citation omitted). Although "[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury [,] . . . [t]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (internal citations omitted).

Similarly, to succeed on a "selective enforcement claim," a plaintiff must show: "(1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Id. at 499 (emphasis added) (quotation and citation omitted). In order to state a selective enforcement claim, a plaintiff must present evidence comparing herself to individuals that are "similarly situated in all material respects." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (internal citations omitted). To satisfy the "all material

respects" standard, a plaintiff must show that his co-employees "were subject to the same . . . evaluation and discipline standards" and that those similarly situated coworkers engaged "in similar conduct." Id. at 40 (citing Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 96 (2d Cir. 1999)). As with a class of one claim, a court may dismiss a selective enforcement claim on summary judgment where "it is clear that no reasonable jury could find the similarly situated prong met." Harlan Assocs., 273 F.3d at 499 n.2.

In opposition to the defendants' motions for summary judgment, Sebold does not identify any similarly situated employees and eschews reference to any facts supporting her claims. Rather, she relies on lengthy, but unhelpful, paragraphs of legal citations. This alone is sufficient cause to grant summary judgment on these claims. See D. Conn. L. Civ. R. 7(a)(1).

Nevertheless, the record does not permit a conclusion that Sebold was "prima facie identical" or "similarly situated in all material respects" to other dispatchers because Sebold's allegations consist of broad generalizations that she was treated differently than her male and younger colleagues. Such sweeping accusations fail to allow rational comparison, as required for either class of one claim or a selective enforcement claim. See Goldfarb v. Town of West Hartford, 474 F. Supp. 2d 356, 367 (D. Conn. 2007).

To the extent that Sebold argues that she was disciplined more harshly than male dispatchers for her role in the Neighbor and Portland Incidents, her claim must still fail because the record does not contain enough evidence to establish that the other dispatchers who were disciplined were comparable to her. The defendants claim that Sebold was disciplined because she served as lead dispatcher during those two incidents and she failed to properly supervise other dispatchers. While Sebold has alleged that the lead dispatcher position was merely titular and, therefore, that her discipline on account of this position was unjustified, the evidence does not support this contention. Although the evidence indicates that some responsibilities of lead and non-lead dispatchers overlapped, undisputed evidence shows that lead dispatchers assigned other dispatchers to specific stations, such as dispatching the police department or answering phones, (see Pl.'s Dep. at 155:21-156:11, 315:23-320:16), and that when Milardo offered her the position he told her that she did not need to know how to dispatch the fire department because she could assign someone to that station during her shifts, (see id. at 315:23-320:16). More important, however, Sebold admits that the lead dispatcher position carried supervisory responsibility. (See id. at 252:4-10 (stating that she told Milardo "many, many times" that she "[could not] be responsible for everyone in [Central Dispatch] when [she was] taking 911 calls").

Sebold's evidence also contradicts her claim that the position was titular, including her complaint that Milardo undermined her authority by yelling at her in front of her coworkers; and that Milardo essentially told her to take the position so that other dispatchers would not boss her around and because it would permit her to receive certain shifts. In short, the record does not support a reasonable inference that the lead dispatcher position had no real supervisory responsibility. Rivera v. Ndola Pharmacy Corp., --- F. Supp. 2d ----, 2007 WL 1874370, at *5 (E.D.N.Y. June 29, 2007) (recognizing the Second Circuit's rule that "[w]hen a plaintiff [on a motion for summary judgment] does rely almost exclusively on her own testimony, the district court may dismiss the case if no reasonable jury would credit plaintiff's testimony") (citing Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005)).

Given that there is no reasonable support for Sebold's claim that the lead dispatcher was merely titular, she cannot support her equal protection claim by comparing herself to non-lead dispatchers.[23] Her claim, then, must rest on a comparison to other identical or similarly situated lead dispatchers who were

_____

[23] The record also does not show whether the dispatchers who were disciplined less harshly had comparable relevant experience, training, or previous on-the-job performance as Sebold had at that time. Given this lack of evidence, no rational juror could conclude that Sebold and the other dispatchers were "prima facie identical" or "similarly situated in all material respects," despite the issue concerning the responsibilities of the lead dispatcher position.

not disciplined as harshly as she was in circumstances like the Portland and Neighbor Incidents.  Because Sebold does not present any such evidence, her claim must fail.

For these reasons, summary judgment is appropriate on Sebold's § 1983 equal protection claims based on class of one and selective enforcement.

VII. <u>First Amendment Retaliation Claim</u>

Sebold brings claims against all defendants under § 1983 and Conn. Gen. Stat. § 31-51q,[24] alleging that they retaliated against her for exercising her First Amendment right to free speech when she complained about how she was treated by Milardo. The defendants move for summary judgment on these claims on the grounds that Sebold has failed to demonstrate that she spoke out on matters of public concern or that the defendants retaliated against her for her speech.  The court agrees.

"To survive a motion for summary judgment on a First Amendment retaliation claim, the plaintiff must present evidence that shows (1) that the speech at issue was protected, (2) that [s]he suffered an adverse employment action, and (3) that there was a causal connection between the protected speech and the adverse employment action."  <u>Cotarelo v. Vill. of Sleepy Hollow</u>

---

[24]  To the extent that Sebold purports to bring claims against Milardo and Thornton in their individual capacities pursuant to Conn. Gen. Stat. § 31-51q, summary judgment must enter on those claims because that statute does not impose individual liability on employees.  <u>See, e.g.</u>, <u>Cook v. McIntosh</u>, 3:97CV773(AHN), 1998 WL 91066, at *6 (D. Conn. Feb. 20, 1998).

Police Dept., 460 F.3d 247, 251 (2d Cir. 2006) (citations and quotations omitted). Whether a particular instance of speech is related to a matter of public concern presents a question of law that must be determined by the "content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48; see also Ezekwo v. New York City Health & Hosp. Corp., 940 F.2d 775, 781 (2d Cir. 1991). Speech of a "public concern" must relate to a matter of political, social or other concern to the community, and the employee must speak "as a citizen upon matters of public concern," not simply "as an employee upon matters only of personal interest." Connick, 461 U.S. at 147. Thus, an employee's speech relating to issues solely concerning the employee personally is generally not protected. See Ezekwo, 940 F.2d at 781. The court's inquiry focuses on the speaker's motive and attempts to discern whether the speech was calculated to redress personal grievances or whether it had a broader public purpose. See Lewis v. Cowen, 165 F.3d 154, 163-64 (2d Cir. 1999). A plaintiff "may not cast [his] personal work grievances in the light of public concern merely by offering [a] conclusory allegation" that his speech or conduct is a matter of public concern. Thorpe v. Luisi, No. 00 Civ. 3144,

2005 WL 1863671, at *6 (S.D.N.Y. Aug. 4, 2005).[25]

As an initial matter, the court cannot say with any certainty what speech Sebold relies on to support her claim. Sebold does not identify any specific speech but only vaguely mentions "complaints about the discriminatory conduct at her workplace." She cites a page from her deposition, but that reference merely states that "if you said anything, you were just persecuted." These "conclusory statements [and] mere allegations [are] not sufficient to defeat a summary judgment motion." Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002).

The defendants, however, point to four of Sebold's statements that she identified in her deposition as constituting protected speech: (1) her complaints about the conditions of her work station; (2) her suggestions regarding changes in the procedure of assigning shifts; (3) the inappropriate use of dispatch surveillance cameras; and (4) the use of off-color jokes in the workplace. But each of these four instances of speech touch upon purely private matters. Her dissatisfaction with the

---

[25] Similarly, Connecticut law makes it illegal for employers "to discipline or discharge on account of the exercise by such employee of rights guaranteed by the First Amendment to the United States Constitution." Conn. Gen. Stat. § 31-51q; see Cotto v. United Tech. Corp., 251 Conn. 1, 16 (1999). Therefore, in this case, the defendants' liability under § 31-51q is contingent on a finding that they violated Sebold's First Amendment right. See Cotto, 251 Conn. at 16 (describing an identical standard to the one for determining First Amendment retaliation under § 1983) (citing Connick v. Myers, 461 U.S. 138, 147 (1983).

conditions of her employment and her complaints about the off-color jokes all involved personal work grievances and, as such, do not pertain to matters of public concern.  See Lewis, 165 F.3d at 164; Ezekwo, 940 F.2d at 781.

Sebold's reliance on Cotarelo, 460 F.3d at 252, for the proposition that the "Second Circuit always considers speech concerning discriminatory employment practices to be matters of public concern," does not alter the court's conclusion because Sebold reads that case too broadly.  Cotarelo concerned allegations "about the growing trend in the [Police Department] regarding bigotry and discrimination directed towards the Spanish-speaking police officers."  Id. at 250.  The Second Circuit determined that such speech touched on a matter of public concern because in that case "[b]oth the letter and the complaints . . . concern discrimination problems generally and were not limited to instances affecting only [the employee]."  Id. at 252 (emphasis added).

Here, however, each of the four complaints cited by the defendants, as well as all of Sebold's grievances, focused entirely on instances of alleged discrimination that affected her alone, from Milardo's alleged retaliation against her to her distaste for her coworkers' lewd comments and boorish pranks.  See Baum v. County of Rockland, 337 F. Supp. 2d 454, 470 (S.D.N.Y 2004) (finding that a public employee's EEOC charge which contained "personal complaints about her lack of training, poor

supervision and her belief that she was being harassed," was
purely personal).

Moreover, the record, even viewed in a light most favorable
to Sebold, does not permit the inference that she spoke out for
any other purpose than to improve her own workplace conditions.
See, e.g., Ezekwo, 940 F.2d at 781 ("Ezekwo was not on a mission
to protect the public welfare.  Rather, her primary aim was to
protect her own reputation and individual development as a
doctor."); White Plains Towing Corp. v. Patterson, 991 F.2d 1049,
1059 (2d Cir. 1993) (holding that even if an issue could arguably
be viewed as a matter of public concern, an employee's First
Amendment right to comment on that issue is entitled to little
weight if the issue was raised solely to further his own
employment interest).

Thus, the discrete and personal nature of Sebold's
complaints and the lack of evidence indicating anything other
than a motive to improve her working conditions compel the
conclusion that Sebold spoke "as an employee upon matters only of
personal interest."  Connick, 461 U.S. at 147.  Therefore,
summary judgment on Sebold's First Amendment retaliation claims
is warranted.

VIII.  <u>Section 1983 Substantive Due Process Claims</u>

Sebold also brings substantive due process claims against
Milardo, Thornton, and the City, alleging simply that "[t]he
conduct of the defendants more than amply shocks the conscience."

The defendants move for summary judgment on these claims on the ground that the conduct alleged by Sebold does not "shock the conscience."  The court agrees that summary judgment must enter on these claims.

Substantive due process protects against government action that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense," rather than action that is merely "incorrect or ill-advised."  <u>Catanzaro v. Weiden</u>, 188 F.3d 56, 64 (2d Cir. 1999).  "In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity . . . ."  <u>Lombardi v. Whitman</u>, 485 F.3d 73, 81 (2d Cir. 2007) (internal quotation omitted).  Thus, the Second Circuit has held that malicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience.  <u>See</u> <u>Johnson v. Newburgh Enlarged Sch. Dist.</u>, 239 F.3d 246, 252 (2d Cir. 2001).

As to Milardo, Sebold's allegations of harassment and retaliation, which resulted in emotional distress, are not so egregious to shock the conscience.  For example, in <u>Santiago de Castro v. Morales Medina</u>, 943 F.2d 129, 130-32 (1st Cir. 1991), the court held that a supervisor's extensive criticism and defamation of teacher was not "conscience shocking," even though it resulted in that teacher suffering from an anxiety disorder

-74-

with depressive characteristics.  Further, in <u>DeLeon v. Little</u>,
981 F. Supp. 728, 735 (D. Conn. 1997), the court held that a
plaintiff's allegations that the defendant "exhibited a hostile
attitude toward her, intimidated and threatened her, harassed her
at home and at work," among other things, did not constitute
conscience-shocking behavior.  Sebold's evidence is no more
egregious than the claims dismissed in these cases.

As to Thornton and the City, no reasonable juror could find
that these defendants were deliberately indifferent to her
complaints to Sebold's complaints.  As discussed above, they
conducted two investigations, and based on those findings,
concluded that Sebold's claims did not warrant a transfer in
violation of the CBA.  While Sebold claims that this response was
inadequate, it was not "clearly unreasonable in light of the
known circumstances."  <u>Gant</u>, 195 F.3d at 141.

For these reasons, summary judgment is appropriate on
Sebold's substantive due process claims.

IX.  <u>Intentional Infliction of Emotional Distress Claims</u>

Finally, Thornton and Milardo move for summary judgment on
Sebold's remaining claims of intentional infliction of emotional
distress on the ground that the evidence fails to show that their

conduct was extreme and outrageous as a matter of law.[26]  The

court agrees.[27]

To prevail on a claim of intentional infliction of emotional

distress, a plaintiff must prove: "(1) that the actor intended to

inflict emotional distress, or that he knew or should have known

that emotional distress was a likely result of his conduct; (2)

that the conduct was extreme and outrageous; (3) that the

defendant's conduct was the cause of the plaintiff's distress;

and (4) that the emotional distress sustained by the plaintiff

was severe."  Petyan v. Ellis, 200 Conn. 243, 253 (1996).

Whether a defendant's conduct is extreme and outrageous is a

---

[26]  Milardo also argues that the court lacks subject matter
jurisdiction over Sebold's claim because she failed to exhaust
her remedies under the CBA.  The court, however, rejects this
argument because her emotional distress claim does not stem from
her contractual right to employment under the CBA; instead it
arises from his conduct toward her, both in and out of the
workplace.  Peters v. Nat'l Wholesale Liquidators of Orange,
Inc., No. CV000070885S, 2002 WL 467761, at *4 n.8 (Conn. Super.
Ct. Mar. 06, 2002) (stating that a remedy provided under a
collective bargaining agreement is considered inadequate where
the dispute concerns a claim that is not "inextricably
intertwined" with consideration of the terms of the labor
contract) (citing Tooley v. Metro N. Commuter R.R. Co., 58 Conn.
App. 497 (2000)); see School Adm'rs Assn. v. Dow, 200 Conn. 376,
383 (1986) (stating that a "complaint sounding in tort will not
in itself prevent arbitration if the underlying contract embraces
the disputed matter").

[27]  Sebold also brought an intentional infliction of
emotional distress claim against the City, but as the City
correctly points out, under Conn. Gen. Stat. § 52-557n(a)(2)(A),
a municipality cannot be liable for intentional tortious acts,
even where an employee is liable.  See Pane v. City of Danbury,
267 Conn. 669, 678 n.9, 685 (2004).  Thus, summary judgment is
appropriate on this claim.

question, in the first instance, for the court. <u>Johnson v. Chesebrough-Pond's USA Co.</u>, 918 F. Supp. 543, 552 (D. Conn.), <u>aff'd</u>, 104 F.3d. 355 (2d Cir. 1996). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" 1 Restatement (Second) of Torts § 46 cmt. d (1965). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." <u>Mellaly v. Eastman Kodak Co.</u>, 42 Conn. Supp. 17, 19 (1991).

Here, summary judgment is appropriate because the conduct of neither Milardo nor Thornton was "extreme and outrageous." While the evidence, viewed in a light most favorable to Sebold, indicates that Milardo's conduct was, at times, belittling, intimidating, and retaliatory, it was not "so naturally humiliating or devastating to a person's emotional well[-]being to rise to the level of conduct which satisfies a claim of intentional infliction of emotional distress." <u>Jamilik v. Yale Univ.</u>, No. 3:06 CV 0566(PCD), 2007 WL 214607, at *3 (D. Conn. Jan. 25, 2007). Indeed, the Connecticut Supreme Court has stated

that employees should expect to experience some level of emotional distress in the workplace.  <u>Perodeau v. City of Hartford</u>, 259 Conn. 729, 757 (2002).

Courts have repeatedly dismissed claims of intentional infliction of emotional distress based on comparable harassment and discrimination by supervisors.  <u>See, e.g.</u>, <u>White v. Martin</u>, 23 F. Supp. 2d 203, 208 (D. Conn. 1998), <u>aff'd</u>, 198 F.3d 235 (2d Cir. 1999) (holding that an employer's allegedly discriminatory denial of a promotion, discipline, and harassment was not extreme or outrageous); <u>DeLeon v. Little</u>, 981 F. Supp. 728, 737-38 (D. Conn. 1997) (holding that a supervisor's conduct was not sufficiently outrageous where the supervisor allegedly ordered the employee to purchase illegal drugs, stand guard while the supervisor ingested the drugs, perform personal errands, and where the supervisor implemented a discriminatory sick leave policy, threatened to replace the employee with a person of a different race, and repeated degrading and humiliating criticism of employee in front of others); <u>Johnson v. Cheseborough-Pond's USA Co.</u>, 918 F. Supp. 543, 551 (D. Conn. 1996) (holding that negative performance reviews, sudden termination, and escort from workplace were not outrageous); <u>Williams v. Perry</u>, 960 F. Supp. 534, 542 (D. Conn. 1996) (holding that racist comments and discriminatory discipline, job performance standards, and work assignments were not outrageous).

Indeed, in <u>Appleton v. Town of Stonington</u>, the Connecticut

Supreme Court dismissed an intentional infliction of emotional distress claim where the plaintiff complained that her supervisor "made condescending comments to her in front of her fellow colleagues questioning her vision and ability to read; telephoned the plaintiff's daughter, representing that the plaintiff had been acting differently and should take a few days off from work; . . . telephoned the police, who came to the school and escorted the plaintiff out of the building to her car[;] . . . subjected her to two psychiatric examinations . . . [; and] forced [her] to take a suspension and a leave of absence and, ultimately, . . . resign." 254 Conn. 205, 211 (Conn. 2000) (alterations omitted). Sebold's complaints fall far short of those rejected by the Connecticut Supreme Court in <u>Appleton</u>.

For these reasons, summary judgment on Sebold's intentional infliction of emotional distress claim is granted.[28]

CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment [docs. ## 74, 76, and 77] are **GRANTED IN PART**

---

[28] The dismissal of Sebold's intentional infliction of emotional distress is not inconsistent with the finding that she may have suffered a hostile work environment. "Although certain conduct motivated by discriminatory animus may be considered indecent or immoral by contemporary cultural standards, and is unlawful under state and federal law, such conduct may not be labeled 'extreme and outrageous' unless it has a 'natural tendency to have an extraordinarily negative effect upon the emotional well-being of any person who is exposed or subject to it.'" <u>Jamilik</u>, 2007 WL 214607, at *3 (quoting <u>Scandura v. Friendly Ice Cream Corp.</u>, No. CV 930529109S, 1996 WL 409337, at *2-3 (Conn. Super. Ct. June 26, 1996)).

and **DENIED IN PART.**  Additionally, the defendants' motion to strike [doc. # 108] is **DENIED,** and the plaintiff's motion to amend her D. Conn. L. Civ. R. 56(a)(2) statement [doc. # 113] is **GRANTED.**

SO ORDERED this 21st day of September, 2007, at Bridgeport, Connecticut.

_____/s/_____<br>
Alan H. Nevas<br>
United States District Judge